## UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF PENNSYLVANIA

SHARON FOLEY,                   :
                                :
                    Plaintiff   :       No. 3:15-CV-1258
                                :
        vs.                     :       (Judge Nealon)
                                :
CAROLYN W. COLVIN, Acting       :       **FILED**
Commissioner of Social Security, :      **SCRANTON**
                                :       NOV 0 3 2016
                    Defendant   :
                                        Per_____
                                             DEPUTY CLERK

### <u>MEMORANDUM</u>

On June 26, 2015, Plaintiff, Sharon Foley, filed this instant appeal[1] under 42

U.S.C. § 405(g) for review of the decision of the Commissioner of the Social

Security Administration ("SSA") denying her application for disability insurance

benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 1461, <u>et</u>

<u>seq</u>. (Doc. 1).  The parties have fully briefed the appeal.  For the reasons set forth

below, the decision of the Commissioner denying Plaintiff's application for DIB

will be affirmed.

---

1. Under the Local Rules of Court "[a] civil action brought to review a decision of
the Social Security Administration denying a claim for social security disability
benefits" is "adjudicated as an appeal."  M.D. Pa. Local Rule 83.40.1.

## BACKGROUND

Plaintiff protectively filed[2] her application for DIB on August 15, 2012, alleging disability beginning on July 23, 2011, due to a combination of "ADHD, fibromyalgia, depression since 1995, asthma, GERD, back pain, cervical cancer, hbp, stomach problems, arthritis, right foot problems, memory loss, vaginal prolapse, PTSD, bursitis, and trouble sleeping." (Tr. 10, 150-151).[3] These claims were initially denied by the Bureau of Disability Determination ("BDD")[4] on November 6, 2012. (Tr. 10). On December 21, 2012, Plaintiff filed a written request for a hearing before an administrative law judge. (Tr. 10). An oral hearing was held on November 20, 2013, before administrative law judge Jarrod Tranguch , ("ALJ"), at which Plaintiff and impartial vocational expert Josephine Doherty, ("VE"), testified. (Tr. 10). On December 5, 2013, the ALJ issued a decision denying Plaintiff's request for DIB. (Tr. 7-20). Plaintiff filed a request

---

2. Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits. A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

3. References to "(Tr. _)" are to pages of the administrative record filed by Defendant as part of the Answer on August 24, 2015. (Doc. 5).

4. The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance benefits on behalf of the Social Security Administration.

for review with the Appeals Council, and on April 24, 2015, the Appeals Council concluded that there was no basis upon which to grant Plaintiff's request for review. (Tr. 1-6). Thus, the ALJ's decision stood as the final decision of the Commissioner.

Plaintiff filed the instant complaint on June 26, 2015. (Doc. 1). On August 24, 2015, Defendant filed an answer and transcript from the SSA proceedings. (Docs. 4 and 5). Plaintiff filed a brief in support of her complaint on October 7, 2015. (Doc. 6). Defendant filed a brief in opposition on November 3, 2015. (Doc. 7). Plaintiff did not file a reply brief.

Plaintiff was born in the United States on January 17, 1961, and at all times relevant to this matter was considered a "person closely approaching advanced age."[5] (Tr. 144). Plaintiff graduated from high school in 1979, and can communicate in English. (Tr.149, 151). Her employment records indicate that she previously worked as a modular home sales representative and order processor and as a grocery store stocker. (Tr. 152). The records of the SSA reveal that Plaintiff had earnings in the years 1976 through 1987, 1992 through 1996, 1998, 2000

---

5. "Person closely approaching advanced age. If you are closely approaching advanced age (age 50-54), we will consider that your age along with a severe impairment(s) and limited work experience may seriously affect your ability to adjust to other work." 20 C.F.R. § 404.1563(d).

3

through 2004, and 2008 through 2011. (Tr. 131). Her annual earnings range from a low of six hundred twenty-three dollars and thirteen cents ($623.13) in 1977 to a high of sixty-one thousand two hundred dollars and zero cents ($61,200.00) in 2004. (Tr. 131).

In a document entitled "Function Report - Adult" filed with the SSA on September 11, 2012, Plaintiff indicated that she lived in an apartment with her family. (Tr. 184). From the time she woke up to the time she went to bed, Plaintiff would wake up around six (6) to seven (7) in the morning, use the bathroom, go back to sleep until ten (10) or eleven (11) in the morning, get up and start to walk "a bit to loosen up," and then she would sit. (Tr. 185). She then would take a shower and stay in her room. (Tr. 195). Her husband would bring her lunch and take her out of the house, which she stated would wear her out. (Tr. 195). She then would go home, take her medicine, and lie down and watch television or read until bedtime. (Tr. 195). She did not take care of anyone else. (Tr. 185). She had no problems with personal care tasks such as dressing and bathing, but wrote that she did have to change "some of [her] ways of getting ready." (Tr. 185). She stated she was able to prepare simple meals, but was unable to do yard or house work due to pain in her back, legs, arms and stomach and because she was "always out of breath." (Tr. 186-187). She was able to drive

4

a car unaccompanied. (Tr. 187). She shopped for groceries in stores about once a week. (Tr. 187). She stated she could lift up to five (5) to ten (10) pounds. (Tr. 189). She was able to walk "down stairs to upstairs" and then she would "have to sit on [the] bed and get [her] breath and a drink of water." (Tr. 189). She would need to rest five (5) minutes before resuming walking. (Tr. 189). When asked to check items which her "illnesses, injuries, or conditions affect," Plaintiff did not check getting along with others. (Tr. 189).

Regarding concentration and memory, Plaintiff needed special reminders to take her medicine, but did not need reminders to take care of her personal needs or go places. (Tr. 186, 188). She could pay bills, count change, and use a checkbook, but did not handle a savings account because she did not have one. (Tr. 187). She stated that she would forget what a conversation entailed in the middle of it, could sometimes finish what she started, had a difficult time following written and spoken instructions, and did not handle stress or changes in routine well. (Tr. 189-190).

Socially, Plaintiff went outside "about at least once a day." (Tr. 187). She sometimes went to church on sundays, and then would go home. (Tr. 188). She sometimes watched television at night, but could not sit and "watch [television] long, so [she] really didn't get much from it." (Tr. 188). She had  problems

5

getting along with family, friends, neighbors, or others because, as she stated, she would become frustrated with people and be short with them. (Tr. 189).

Plaintiff also completed a Supplemental Function Questionnaire for pain, which she stated began in the 1990s, occurred all over her body, was constant, and was deep and stabbing in nature. (Tr. 192). She stated that her pain had intensified since it began, and was occurring more often. (Tr. 192). Walking, sitting, standing, and cold and hot temperatures all aggravated her pain. (Tr. 192). Her pain was worse in the early morning to early afternoon. (Tr. 192). Plaintiff stated she was taking Ultram, Savella, and Lenotec for pain, and used a TENS unit on her back. (Tr. 193). She stated she did not do physical therapy in Pennsylvania, but had when she lived on the west coast. (Tr. 193).

At her oral hearing on November 20, 2013, Plaintiff testified that she was disabled due to a combination of Major Depressive Disorder, Attention Deficit Hyperactivity Disorder ("ADHD"), Post Traumatic Stress Disorder ("PTSD"), chronic low back pain, facet joint arthropathy at from L3-S1 levels, asthma, frequent headaches, and degenerative joint disease in her left shoulder. (Tr. 55).

In terms of activities of daily living, Plaintiff testified that she had not driven a car for the last year, had difficulty with personal care tasks such as bathing, was unable to do household chores, was able to shop for groceries, had no

hobbies, and was unable to read because she could not comprehend what she was reading. (Tr. 58-59, 71-72). She stated that she could lift and carry between five (5) to ten (10) pounds, could walk for fifteen (15) minutes before needing to rest, and could stand in one position for fifteen (15) minutes before needing to rest. (Tr. 79-80). With regards to her symptoms, Plaintiff testified that she had a "hard time talking with people," was confused, had racing thoughts, had difficulty remembering things, was fatigued, felt depressed, had tinnitus, had pain all over from arthritis and fibromyalgia, and had difficulty concentrating. (Tr. 69-70, 72). She also testified that she had received unemployment compensation for one (1) year after she lost her job at a modular home company, and acknowledged that, in order to receive unemployment benefits, she had to certify that she was able and available to work. (Tr. 62-63).

## MEDICAL RECORDS

### A. Medical Evidence

On September 27, 2011, Plaintiff had an appointment with Steven Yordy, M.D., "to have a form filled out for temporary disability and medical assistance." (Tr. 442). It was noted that Plaintiff had pain that she thought was from her fibromyalgia, and that all her muscles had been aching. (Tr. 442). Her physical exam revealed a normal range of motion, muscle strength, and stability in all

7

extremities with no pain on inspection. (Tr. 443).

On October 13, 2011, Plaintiff had an appointment with Dr. Yordy for back pain. (Tr. 440). She received an injection of Toradol. (Tr. 44). Her physical exam showed mild paraspinal "TTP over LS spine." (Tr. 440).

On June 6, 2012, Plaintiff had an appointment with Dr. Yordy to receive a Toradol shot for back pain. (Tr. 434).

On September 4, 2012, Plaintiff had an appointment with Dr. Yordy for back pain and abdominal pain. (Tr. 732). Plaintiff reported pain in her entire back that radiated to her thighs and was aggravated by daily activities. (Tr. 732). Her chronic problems were listed as asthma, backaches, hypertension, depressive disorder, esophageal reflux, and myalgia. (Tr. 732). Her physical exam revealed clear lungs, multiple tender points in her musculoskeletal system, and a normal abdomen. (Tr. 733). Plaintiff was assessed as having fibromyalgia, depressive disorder, and hypertension. (Tr. 734). She was prescribed Savella for fibromyalgia. (Tr. 734).

On October 4, 2012, Plaintiff had a follow-up appointment with Dr. Yordy. (Tr. 736). It was noted that she was stable, and that the Savella was working well for her fibromyalgia. (Tr. 736). Plaintiff was scheduled for a follow-up in five (5) months. (Tr. 738).

On March 1, 2013, Plaintiff had an appointment with Dr. Yordy due to nausea and "bring[ing] up blackish sputum." (Tr. 639). Dr. Yordy placed Plaintiff on Reglan. (Tr. 640).

On March 23, 2013, Plaintiff had an appointment David Talabiska, D.O. due to complaints of a cough, heartburn, and shortness of breath. (Tr. 654). She also reported that she had been experiencing heartburn, dysphagia, regurgitation, nausea, bloating, belching, hoarseness, cough, and awakening with coughing, but no chest discomfort, weight loss, pain, sore throating, vomiting, diarrhea, wheezing or anemia. (Tr. 654). Her active problems were listed as abdominal pain, anxiety disorder, arthritis, asthma, depression, esophageal reflux, hypertension, and nausea. (Tr. 654). Her medications at this visit included Metoclopramid, Omeprazole, Savella, and Temazepam. (Tr. 654). Her physical exam was normal, including recent and remote memory, insight and judgment, and affect and mood. (Tr. 655). Plaintiff was scheduled for an EGD and was prescribed Aciphex. (Tr. 655).

On June 6, 2013, Plaintiff had an appointment with Dr. Yordy due to complaints of difficulty breathing and worsening hearing. (Tr. 636). She also reported that she was in an extreme amount of pain after a recent fall in which she injured her wrist and tail bone. (Tr. 636). Dr. Yordy noted he would refer

9

Plaintiff to a pulmonologist. (Tr. 637). A CT scan of Plaintiff's chest performed on this date revealed clear lungs with a mild degree of thoracic scoliosis and mild spondylotic changes. (Tr. 661).

On June 17, 2013, Plaintiff had an appointment with Neerja Gulati, M.D. for complaints of gradual onset of intermittent episodes of moderate shortness of breath that started eight (8) years ago, were relieved by rest and sitting up, were made worse by walking, climbing stairs, exercise, and talking, and had been worsening over time. (Tr. 632). Her physical examination revealed normal pulmonary function. (Tr. 634). Plaintiff was scheduled for a Pulmonary Function Test and a CT scan of her chest. (Tr. 634).

On June 24, 2013, Plaintiff underwent a Pulmonary Function Study for asthma. (Tr. 621). The impression was that Plaintiff's study was normal. (Tr. 621).

On June 27, 2013, Plaintiff had an appointment with Lisa Ayers, D.O. due to hearing loss, tinnitus, and ear fullness complaints. (Tr. 617). Crowds and background noise exacerbated her hearing loss symptoms, and the onset occurred three (3) to four (4) weeks earlier after a fall. (Tr. 617). Relieving factors included turning her head. (Tr. 617). Associated symptoms included dizziness, lightheadedness, vertigo, and misjudging distances and depth of objects. (Tr.

10

617).  Plaintiff reported that her symptoms occurred all the time.  (Tr. 617).  Her physical examination was normal.  (Tr. 617-619).  Her mood and affect were appropriate , and her hearing impairment was not consistent as she heard a soft spoken voice while her head was turned away, but had more difficulty with hearing a loud voice while looking directly at someone.  (Tr. 619).  Dr. Ayers assessed Plaintiff as having an Abnormal Auditory Perception, dizziness, chrnoic reflux esophagitis, and chronic rhinitis.  (Tr. 620).  She recommended that Plaintiff start taking Omeprazole, and schedule a hearing physical therapy appointment.  (Tr. 620).

On July 9, 2013, Plaintiff had an appointment with Dr. Yordy to receive a Toradol injection for back pain.  (Tr. 610).  Her physical examination was normal.  (Tr. 610).  She was assessed as having a Solitary Pulmonary Nodule, myalgia, Generalized Anxiety Disorder, and headaches.  (Tr. 611).

On July 19, 2013, Plaintiff had an appointment with audiologist Marcia Bowman-Gilbert, Au.D. for a central auditory processing evaluation.  (Tr. 600).  Plaintiff reported that she had difficulty understanding and retaining auditory information, especially in the presence of background noise.  (Tr. 600).  She also reported that she struggled following multi-step directions and often asked people to repeat themselves when speaking in person or on the phone.  (Tr. 600).  Plaintiff

11

also reported that she had been experiencing tinnitus, dizziness, aural fullness, and

occasional headaches. (Tr. 600). The impression was that:

> The results of the auditory processing test battery are most
> consistent with three Central Auditory Processing Disorder
> (CAPD) categories. Test results support deficits in decoding,
> tolerance- fading memory (TFM), and integration. Deficits in
> decoding are due to the patient's inability to quickly and
> accurately process speech. Deficits in decoding are often
> characterized by poor phonics, oral reading accuracy, receptive
> language, oral comprehension, and articulation. Tolerance-
> Fading Memory deficits are characterized by poor memory and
> difficulty hearing in the presence of competing speech. TFM
> deficits are often indicated by learning and communication
> difficulties, specifically reading comprehension, auditory
> figure-ground, short term memory, expressive language, and
> distractibility. Sharon also demonstrated difficulty with
> integration which is characterized by the inability to bring
> together information (e.g. auditory-visual). Individuals with
> integration issues often have severe learning difficulty in the
> area of reading, which is consistent with Sharon's history of
> reading comprehension. Integration deficits are often
> categorized in two types. Type 1 categorization often includes
> diagnoses of decoding problems and/ or dyslexia. Type 2
> categorization is characterized by poor learning performance
> and tolerance fading memory problems. Although today's
> testing is consistent with CAPD, results need to be interpreted
> with caution because other influencing factors have not been
> ruled out. The processing of spoken language involves
> auditory processing, cognition, and language. Because of this,
> the auditory processing test results described above should be
> viewed as only one component needed to understand the
> individual's difficulties in understanding spoken language.

(Tr. 603-604). Dr. Bowman-Gilbert recommended that Plaintiff: undergo auditory

training by a hearing therapist to learn compensatory strategies to improve

listening and speech understanding; learn and use communication strategies to

improve speech understanding; and undergo a psychological evaluation to assess

her learning aptitude and personality/ adjustment factors to rule out possible

influencing factors. (Tr. 604).

On October 22, 2013, Plaintiff had an appointment with Dr. Gulati due to

complaints of shortness of breath. (Tr. 754). Plaintiff stated that she had "been

stable with her asthma control since the last visit." (Tr. 754). Her physical

examination was normal, and she was assessed as having asthma and shortness of

breath. (Tr. 756-757). She was instructed to use a nebulizer and peak flow meter

device, and follow-up in three (3) months. (Tr. 757).

### B.   **Medical Opinions**

#### 1.   **Dr. Yordy**

On September 27, 2011, Dr. Yordy opined that Plaintiff was temporarily

disabled until December 31, 2011 due to hypertension, GERD, depression,

fibromyalgia, and asthma. (Tr. 532, 746).

On July 3, 2013, Dr. Yordy opined that Plaintiff was temporarily disabled

for less than (12) months, and thus precluded from participating in any form of

employment, due to fibromyalgia, depression, asthma, ADHD, hypertension,

GERD, back pain, and a history of cervical cancer. (Tr. 429-530).

## 2.   Dr. Jacqueline Sallade

On October 10, 2012, Jacqueline Sallade, Ed.D., performed a consultative examination of Plaintiff. (Tr. 538-544). Plaintiff's physical examination revealed she: was cooperative, depressed, and anxious and had normal eye contact, slightly spontaneous but pressured speech, a varied thought stream, an easily distractible thought continuity, inconsistent thought processes ranging from poor to average and suggesting a learning disability, average abstract thinking, borderline store of information and concentration, poor memory, difficulty with remote and recent events, poor immediate retention and recall, poor impulse control, poor social judgment, and minimal insight. (Tr. 538-542). Dr. Sallade stated that her diagnoses included ADHD, a learning disorder, mild dementia, PTSD, Dysthymic Disorder, Mixed Personality Disorder, mixed substance abuse in remission, fibromyalgia, cervical cancer in remission, GERD, asthma, and high blood pressure. (Tr. 542). Dr. Sallade opined that Plaintiff's prognosis was poor, "as a combination and severity of disorders interact to make it very difficult for her to function and she will need to have medical and psychological care from many years to come." (Tr. 542). Dr. Sallade opined that Plaintiff could not understand, retain, or follow instructions in a regular work setting; could not sustain attention

14

to perform simple, repetitive tasks in a regular work setting; could not tolerate stress and pressures in a regular work environment; and would need repetition to focus on low-stress tasks. (Tr. 542-544). Dr. Sallade opined that Plaintiff had extreme limitations in her ability: to understand, remember, and carry out both short, simple and detailed instructions; to make judgments on simple work-related decisions; to interact appropriately with the public, supervisors, and co-workers; to respond appropriately to work pressures in a usual work setting; and to respond appropriately to changes in a routine work setting. (Tr. 536). Dr. Sallade did not state what medical or clinical findings supported this assessment. (Tr. 537).

### 3. **Dr. Kimberly Jones**

On October 13, 2012, Kimberly Jones, D.O. performed a consultative examination of Plaintiff. (Tr. 545-551). Plaintiff's self-reported symptoms included: pain in her left hip; back pain that was worse after going up the stairs; pain all over due to fibromyalgia; paresthesias in her left thigh; forgetfulness; depression; anxiety; panic attacks; difficulty breathing; and daily vomiting. (Tr. 545-546). She reported that she could dress and feed herself, stand for up to fifteen (15) minutes at a time, lift less than five (5) pounds, drive a car, cook, shop, and vacuum for a short amount of time. (Tr. 547). Her physical examination revealed she: was mildly anxious and somewhat tearful at times; had hearing that

15

was normal to conversational tone; had clear lungs; had a soft, nontender, and non-distended abdomen; had a small amount of soft tissue swelling at the base of her spine; had a normal gait without an assistive device; had full range of motion and 5/5 grip strength in her bilateral upper extremities; had normal range of motion in her lower bilateral extremities; had equal and symmetric sensation bilaterally; could walk on her toes, squat, and do heel-to-toe walking; had somewhat hyperactive mentation and was difficult to redirect throughout the exam; was able to follow simple directions with minimal prompting; and had tangential thinking. (Tr. 549-550). Dr. Jones' impression was that Plaintiff had ADHD, hypertension, fibromyalgia, depression, history of asthma, GERD, "stated back pain," and a history of cervical cancer. (Tr. 550). Dr. Jones opined that she found no objective functional limitation during Plaintiff's exam due to a normal range of motion, clear lungs, a lack of shortness of breath during ambulation, a normal ability to stand, walk, sit, hearing, speak, and see, and good fine manipulative skills of her hands. (Tr. 550-551).

### 4.   David Hutz, M.D.

On November 1, 2012, David Hutz, M.D., completed a Physical Residual Functional Capacity form for Plaintiff. (Tr. 96). He opined that Plaintiff could occasionally lift and/ or carry twenty (20) pounds; frequently lift and/ or carry ten

(10) pounds; sit and stand and/or walk for six (6) hours in an eight (8) hour workday; engage in unlimited pushing and pulling within the aforementioned weight limitations; occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; never climb ladders, ropes, or scaffolds; and should avoid concentrated exposure to extreme heat and cold, wetness, vibration, fumes, odors, dusts, gases, poor ventilation, and hazards such as machinery and heights. (Tr. 96-98).

### 5.   Paul A. Perch, E.D.D.

On November 11, 2012, Paul A. Perch, E.D.D., a state agency psychologist, completed a Psychiatric Review Technique and Mental Residual Functional Capacity form. (Tr. 95-101). He opined that Plaintiff had moderate difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace, and mild restriction in her activities of daily living. (Tr. 95). He also opined that, while Plaintiff was markedly limited in her ability to understand and remember detailed instructions, she could understand, remember, and carry out simple, one (1) to two (2) step instructions. (Tr. 99). He further opined that Plaintiff was not significantly limited in maintaining attention and concentration for extended periods and could sustain an ordinary routine and adapt to routine changes. (Tr. 100). According to Dr. Perch, Plaintiff was moderately limited in

her ability to interact appropriately with the general public and to accept instructions and respond appropriately to criticism from supervisors. (Tr. 100). Dr. Perch noted that Dr. Sallade's opinion was an overestimate of Plaintiff's limitations, was internally inconsistent, was based on Plaintiff's subjective complaints, and was not supported by the medical record. (Tr. 95).

## STANDARD OF REVIEW

When considering a social security appeal, the court has plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995). However, the court's review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence." Id.; Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993); Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988). Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981) ("Findings of fact by the

Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988) (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213. In an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the

19

record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason, 994 F.2d at 1064. The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-07. Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

## SEQUENTIAL EVALUATION PROCESS

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A). Further,

> [a]n individual shall be determined to be under a disability only
> if his physical or mental impairment or impairments are of such
> severity that he is not only unable to do his previous work but
> cannot, considering his age, education, and work experience,
> engage in any other kind of substantial gainful work which
> exists in the national economy, regardless of whether such
> work exists in the immediate area in which he lives, or whether

a specific job vacancy exists for him, or whether he would be
hired if he applied for work.  For purposes of the preceding
sentence (with respect to any individual), "work which exists in
the national economy" means work which exists in significant
numbers either in the region where such individual lives or in
several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner uses a five-step process in evaluating disability and

claims for disability insurance benefits.  See 20 C.F.R. § 404.1520; Poulos, 474

F.3d at 91-92.  This process requires the Commissioner to consider, in sequence,

whether a claimant (1) is engaging in substantial gainful activity, (2) has an

impairment that is severe or a combination of impairments that is severe, (3) has

an impairment or combination of impairments that meets or equals the

requirements of a listed impairment, (4) has the residual functional capacity to

return to his or her past work and (5) if not, whether he or she can perform other

work in the national economy.  Id.  As part of step four, the Commissioner must

determine the claimant's residual functional capacity.  Id.  If the claimant has the

residual functional capacity to do his or her past relevant work, the claimant is not

disabled.  Id.  "The claimant bears the ultimate burden of establishing steps one

through four."  Residual functional capacity is the individual's maximum

remaining ability to do sustained work activities in an ordinary work setting on a

regular and continuing basis.  See Social Security Ruling 96-8p, 61 Fed. Reg.

34475 (July 2, 1996).  A regular and continuing basis contemplates full-time

employment and is defined as eight hours a day, five days per week or other

similar schedule.  The residual functional capacity assessment must include a

discussion of the individual's abilities.  Id.; 20 C.F.R. §§ 404.1545 and 416.945;

Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that

which an individual is still able to do despite the limitations caused by his or her

impairment(s).").

"At step five, the burden of proof shifts to the Social Security

Administration to show that the claimant is capable of performing other jobs

existing in significant numbers in the national economy, considering the

claimant's age, education, work experience, and residual functional capacity. "

Poulos, 474 F.3d at 92, citing Ramirez v. Barnhart, 372 F.3d 546, 550 (3d Cir.

2004).

## ALJ DECISION

Initially, the ALJ determined that Plaintiff met the insured status

requirements of the Social Security Act through the date last insured of September

30, 2012. (Tr. 12).  At step one, the ALJ found that Plaintiff had not engaged in

substantial gainful work activity from her alleged onset date of July 23, 2011.  (Tr.

22

12).

At step two, the ALJ determined that Plaintiff suffered from the severe[6] combination of impairments of the following: "low back pain, asthma, depression, attention deficit hyperactivity disorder (ADHD) and post-traumatic stress disorder (PTSD) (20 C.F.R. 404.1520(c))." (Tr. 12).

At step three of the sequential evaluation process, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526). (Tr. 14-17).

At step four, the ALJ determined that Plaintiff had the RFC to perform light work with limitations. (Tr. 17-22). Specifically, the ALJ stated the following:

> After careful consideration of the entire record, the undersigned
> finds that, through the date last insured, [Plaintiff] had the
> [RFC] to perform a range of light work as defined in 20 CFR
> 404.1567(b) in that [Plaintiff] can occasionally lift and carry
> twenty pounds and frequently lift and carry ten pounds.

---

6. An impairment is "severe" if it significantly limits an individual's ability to perform basic work activities. 20 C.F.R. § 404.921. Basic work activities are the abilities and aptitudes necessary to do most jobs, such as walking, standing, sitting, lifting, pushing, seeing, hearing, speaking, and remembering. Id. An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work. 20 C.F.R. § 416.921; Social Security Rulings 85-28, 96-3p and 96-4p.

> [Plaintiff] can stand and/ or walk six hours and sit six hours in an eight-hour workday. [Plaintiff] can occasionally balance, stoop, kneel, crouch, crawl, use ramps and stairs, but must avoid ladders, ropes or scaffolds. [Plaintiff] must avoid exposure to extreme cold and heat, wet or slippery conditions, vibrations and pulmonary and respiratory irritants, such as fumes, odors, dusts, gases and work environments with poor ventilation. [Plaintiff] must avoid hazards, such as unprotected heights and moving machinery. [Plaintiff] can perform unskilled work involving only simple, routine tasks not performed in a fast-paced production environment. [Plaintiff] can perform low stress work involving only occasional simple decision-making and occasional changes in the work duties or work setting. [Plaintiff] can have occasional contact with co-workers or supervisors. [Plaintiff] can have rare or incidental contact with customers and the public.

(Tr. 17).

At step five of the sequential evaluation process, because Plaintiff could not perform any past relevant work, and considering the her age, education, work experience, and RFC, the ALJ determined "there are jobs that exist in significant numbers in the national economy that the [Plaintiff] can perform (20 C.F.R. 404.1569 and 404.1569(a))." (Tr. 22-23).

Thus, the ALJ concluded that Plaintiff was not under a disability as defined in the Social Security Act at any time between July 23, 2011, the alleged onset date, and the date last insured, September 30, 2012. (Tr. 23).

## DISCUSSION

On appeal, Plaintiff asserts that the ALJ's decision is not supported by substantial evidence because improper weight was given to the opinion of consultative examiner Dr. Sallade. (Doc. 6, pp. 9-10). Defendant disputes this contention. (Doc. 7, pp. 15-24).

### 1.  Opinion Evidence

Plaintiff argues that substantial evidence does not support the ALJ's RFC determination because improper weight was afforded to the opinion consultative examiner Dr. Sallade. (Doc. 6, pp. 9-10). Defendant asserts that the ALJ did not err in affording this opinion little weight because it was internally inconsistent and inconsistent with the medical record as a whole, it was based on Plaintiff's subjective, self-reported limitations, was inconsistent with Plaintiff's stated activities of daily living, and was undermined by post-assessment evidence. (Doc. 7, pp. 15-22).

The responsibility for deciding a claimant's RFC rests with the administrative law judge. See 20 C.F.R. § 404.1546. In arriving at the RFC, an administrative law judge should be mindful that the preference for the treating physician's opinion has been recognized by the Third Circuit Court of Appeals and by all of the federal circuits. See, e.g., Morales v. Apfel, 225 F.3d 310, 316-

18 (3d Cir. 2000).  This is especially true when the treating physician's opinion

"reflects expert judgment based on a continuing observation of the patient's

condition over a prolonged time." Morales, 225 F.3d at 317; Plummer, 186 F.3d

at 429; see also 20 CFR § 416.927(d)(2)(i)(1999) ("Generally, the longer a treating

source has treated you and the more times you have been seen by a treating source,

the more weight we will give to the source's medical opinion.").

However, when the treating physician's opinion conflicts with a non-

treating, non-examining physician's opinion, the ALJ may choose whom to credit

in his or her analysis, but "cannot reject evidence for no reason or for the wrong

reason." Morales, 225 F.3d 316-18.  It is within the ALJ's authority to determine

which medical opinions he rejects and accepts, and the weight to be given to each

opinion.  20 C.F.R. § 416.927.  The ALJ is permitted to give great weight to a

medical expert's opinion if the assessment is well-supported by the medical

evidence of record.

Pursuant to Social Security Regulation 96-6p, an administrative law judge

may only assign less weight to a treating source opinion based on a non-treating,

non-examining medical opinion in "appropriate circumstances."  SSR 96-6p, 1996

SSR LEXIS 3.  This regulation does not define "appropriate circumstances," but

gives an example that "appropriate circumstances" exist when a non-treating, non-

examining source had a chance to review "a complete case record . . . which provides more detailed and comprehensive information than what was available to the individual's treating source." Id. (emphasis added).

Additionally, in choosing to reject the evaluation of a treating physician, an ALJ may not make speculative inferences from medical reports and may reject the treating physician's opinions outright only on the basis of contradictory medical evidence. Morales, 225 F.3d at 316-18. An ALJ may not reject a written medical opinion of a treating physician based on his or her own credibility judgments, speculation or lay opinion. Id. An ALJ may not disregard the medical opinion of a treating physician based solely on his or her own "amorphous impressions, gleaned from the record and from his evaluation of the [claimant]'s credibility." Id. As one court has stated, "Judges, including administrative law judges of the Social Security Administration, must be careful not to succumb to the temptation to play doctor" because "lay intuitions about medical phenomena are often wrong." Schmidt v. Sullivan, 914 F.2d 117, 118 (7th Cir 1990).

Regardless of what the weight an administrative law judge affords to medical opinions, the administrative law judge has the duty to adequately explain the evidence that he or she rejects or affords lesser weight. Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 505-06 (3d Cir. 2009). "The ALJ's explanation must be

sufficient enough to permit the court to conduct a meaningful review." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 119-20 (3d Cir. 2000).

In the case at hand, regarding the mental health impairment medical opinion evidence,[7] the ALJ gave little weight to the opinion of Dr. Sallade because "it is not supported by substantial evidence, in that it is inconsistent with the claimant's treatment history and not supported by any treatment records from a mental health professional. The opinion is based on a one-time examination and appears to rely on the claimant's self-reported limitations." (Tr. 20). Instead, the ALJ gave great weight to the opinion of Dr. Perch because it was "consistent with the claimant's treatment history, the clinical findings of her treating physicians and with the evidence of record when considered in its entirety and accounts for subjective complaints and self-reported limitations." (Tr. 22).

In reading the decision as a whole and upon review of the entire record, it is determined that the weight the ALJ afforded to the mental health medical opinions is supported by substantial evidence. "The ALJ's explanation must be sufficient enough to permit the court to conduct a meaningful review." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 119-20 (3d Cir. 2000); see Jones v. Barnhart, 364 F.3d

---

7. Because Plaintiff does not challenge the weight the ALJ afforded to the medical opinions involving her physical impairments, these opinions need not be addressed in this discussion.

501, 505 (3d Cir. 2004) (holding that while an administrate law judge is required to set forth the reasons for his or her decision, and that a bare conclusory statement is insufficient to meet this requirement, an ALJ is not required to "use particular language or adhere to a particular format in conducting his analysis. Rather, the function of <u>Burnett</u> is to ensure that there is sufficient development of the record and explanation of finding to permit meaningful review."); <u>see also</u> <u>Diaz v.</u> <u>Commissioner of Social Security</u>, 577 F.3d 500, 504 (3d Cir. 2009) ("In <u>Burnett,</u> we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements that a condition does not constitute the medical equivalent of a listed impairment are insufficient. The ALJ must provide a 'discussion of the evidence' and an 'explanation of reasoning' for his conclusion sufficient to enable meaningful judicial review. <u>Id.</u> at 120; <u>see</u> <u>Jones v. Barnhart,</u> 364 F.3d 501, 505, n.3 (3d Cir. 2004). The ALJ, of course, need not employ particular 'magic' words: '<u>Burnett</u> does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis.' <u>Jones</u>, 364 F.3d at 505.").

While, in the opinion analysis section of the RFC determination, the ALJ does not directly identify the evidence he determines to be inconsistent with the opinion of Dr. Sallade, this evidence can be found throughout the opinion when

29

read as a whole. The evidence, included in the ALJ's opinion, that is inconsistent

with Dr. Sallade's opinion that Plaintiff had marked limitations, particularly in her

abilities relating to concentration, includes the following: (1) the treatment notes

from Plaintiff's multiple appointments with treating physician Dr. Yordy that

make almost no mention of mental health symptoms or impairments and indicate

only that Dr. Yordy occasionally prescribed psychiatric medication to Plaintiff; (2)

the notes from Dr. Sallade's own examination that state that Plaintiff was

adequately dressed, was cooperative, had intelligible speech, had no nervous

gestures, tics, or mannerisms, and could follow simple instructions; (3) the notes

from Dr. Jones' examination of Plaintiff, who found that she was only mildly

anxious, had coherent speech, was cooperative, and followed simple directions

with minimal prompting; (4) the opinion issued by Dr. Perch that noted Plaintiff

was not significantly limited in her ability to maintain attention and concentration

for extended periods of time and that Plaintiff would be able to understand,

remember, and follow simple, one (1) to two (2) step instructions; (5) Plaintiff's

own self-reported activities of daily living, which included driving a car by

herself, weekly grocery shopping, taking care of her personal care needs by

herself, attending church, paying bills, counting change, and using a checkbook;

and (6) the treatment records that post-date Plaintiff's date last insured and that

30

were reviewed by the ALJ in his decision which show that Plaintiff had

unimpaired recent and remote memory, a normal mood and affect, intact insight

and judgment, and an ability to understand a diagnosis and accompanying

instructions.   (Tr. 185-187, 445-449, 461-463, 472-474, 536-542, 547-549, 619,

626, 634, 655, 756).   As such, the ALJ's RFC determination is supported by

substantial evidence, and the ALJ's decision will not be disturbed on appeal.

## CONCLUSION

Based upon a thorough review of the evidence of record, the Court finds

that the Commissioner's decision is supported by substantial evidence.   Therefore,

pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner will be affirmed,

and the appeal will be denied.

A separate Order will be issued.

**Date**: November 3, 2016

/s/ William J. Nealon
**United States District Judge**

31